IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| VS. ) | CASE NO. 1:17-cr-00035-DHB-BKE-3 |
| ) | |
| DWAYNE OSWALD FULTON, ) | |
| ) | |
| DEFENDANT ) | |

## MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

NOW COMES the Defendant, DWAYNE OSWALD FULTON, and moves that this Court terminate his supervised release and, in support thereof, shows:

1. That the Defendant was indicted on June 7, 2017.

2. That the Defendant entered a plea of guilty to *Conspiracy Count 1* set forth in the indictment; entered into a plea agreement, and had a Final Judgment entered against him on June 4, 2018 ordering him to sixty (60) months custody to Bureau of Prisons, three (3) years supervised release, $100.00 special assessment, and $50,000 fine.

3. That the Defendant has served his term of incarceration; has paid his fine; has paid the special assessment fee; has fully cooperated with the United States of America, and has fully cooperated with the Federal Probation Officers in connection with the above-captioned case.

4. That the Defendant has served well in excess of one (1) year of his supervised release and as of May 13, 2024, has completed twenty-six (26) months of the 36-month supervised release.

5. That under the provisions of 18 U.S.C. §3583(e), this Court, after considering the factors set forth in 18 U.S.C. §3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6) and (a)(7), has authority to release the Defendant from the terms and provisions of his supervised release sentence.

6. That in considering the nature and circumstances of this offense and the history and character of the Defendant, the Defendant has never had any problem or trouble with law enforcement prior to this time; fully cooperated with the United States Attorney's Office, and the United States Attorney's Office filed a motion under Sentencing Guideline 5K1, even though the Court did not vary from the guidelines.

7. That the sentence already served by the Defendant has afforded adequate deterrence to this type of criminal conduct.

8. That the sentence already served will protect the public from any crimes of the Defendant.

9. That the Defendant is in need of being able to return to work and to be able to travel without any restrictions, in that he has a grown daughter who is in college and currently doing an internship in California

10. That this Defendant previously requested early termination and sought clarification of the terms of supervised release on April 6, 2022 (Docket Entry No. 244 and Docket Entry Nos. 248, 249, and 250).

11. That this Court, in denying the motion on April 10, 2023, held that the motion was "simply premature."

12. That in that the Defendant has never violated any term of his supervised release; has cooperated with his probation officer; has paid his fine and is now sixty-five (65) years of age, and has completed over two-thirds (2/3) of his term of supervised release, he should be eligible for early termination.

13. That the Defendant has an employment opportunity in Kuwait to be a consultant to the Kuwait government and the early termination of his supervised release will enable him to become employed and earn money to repay his former wife for funds that she has paid for their daughter's education at Emory University.

14. That the United States Sentencing Commission has published guidelines that encourage courts to exercise their discretion in cases such as this to terminate supervised release.

15. That the termination of supervised release will save money and will not cause any harm to the public.

16. That the early termination of supervised release saves substantial money. In the fiscal year 2012, supervision of more than 7,000 defendants were

terminated early saving the judiciary more than $7.7 million. That practice promotes justice, conserves resources, and protects the public. The Judicial Council has endorsed early termination of supervised release in those situations that it is not needed for the protection of the public. That early termination promotes stable community for the Defendant's reintegration into society. In this case, there is no history of violence and no recent evidence of alcohol or drug abuse, or psychiatric episodes, and there is no identifiable risk of public safety. *See* Exhibits "A" and B" attached hereto.

      For the reasons set forth herein, the Defendant respectfully requests that his supervised release be terminated.

      This 14th day of May, 2024.

                                      /s/***John B. Long***
                                      JOHN B. LONG, ESQ.
                                      Georgia State Bar No. 457200
                                      Attorney for Defendant

OF COUNSEL:

TUCKER LONG, P.C.
P. O. BOX 2426
453 GREENE STREET
AUGUSTA, GA  30903
(706) 722-0771
(706) 722-7028 Fax
jlong@tuckerlong.com

# Early Termination of Supervision: No Compromise to Community Safety

*Laura M. Baber*
*James L. Johnson*
*Office of Probation and Pretrial Services*
*Administrative Office of the U.S. Courts*

**UNDER 18 U.S.C. §§ 3564(c)** and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision, if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice. As such, early termination is a practice that holds promise as a positive incentive for persons under supervision and as a measure to contain costs in the judiciary without compromising the mission of public safety.

## Policy Background

Over the past decade, the Judicial Conference has endorsed policies that encourage probation offices to terminate statutorily-eligible offenders from supervision early as a means to limit projected workload growth in probation and pretrial services, and has continued to fine-tune those policies as evidence suggests is appropriate. In 2003, the Judicial Conference approved a policy that encouraged probation officers to seek early termination as soon as offenders were statutorily eligible if the offender had satisfied the conditions of supervision, had successfully reintegrated into the community, and did not pose a foreseeable risk to public safety generally or to any individual third party. In 2005, the Judicial Conference approved policy changes that allowed offenders with outstanding balances on fines and restitutions to be considered for early termination as long as they were otherwise suitable and in compliance with their payment schedule. In 2005, the Committee revisited the early termination policy, recommending provisions modeled after United States Parole Commission regulations. Specifically, the Conference approved creating a presumption in favor of early termination for non-career and non-violent offenders who 1) have been under supervision for at least 18 months, present no identified risk to the public or victims, and are free from any moderate- or high-severity violations; or 2) have been under supervision for at least 42 months and are free from any moderate- or high-severity violations. These policies remain in effect today.

Policies on early termination have clearly influenced practices in the courts. The number of early terminations granted by the courts increased 50 percent in the year following the Criminal Law Committee's formal endorsement in 2002 of early termination as a cost-containment measure. As Table 1 reports, by 2005, early terminations comprised 21.3 percent of successful closings (i.e., cases closed without revocation). From 2007 to 2011, which were relatively favorable budget years, the percentage fell to 17.9 percent. However, in 2012, perhaps as a response to austere budgets and renewed focus on early termination as a cost-containment strategy, early terminations rose nearly a percentage point to 18.7 percent, comparable to 2008 levels.

The overall decline in the percentage of early-term cases from 2005 may be the result of the changing nature of persons under supervision, as the average risk prediction and criminal history scores of persons under supervision have been steadily rising. Also, belying the national trend is considerable district-to-district variation, with early termination rates ranging from 46 percent of successful closings in one district to zero in another.

The focus on early termination for purposes of cost containment has been based on the belief that, if limited to appropriate cases, early termination would not adversely affect community safety. A preliminary study conducted by the AO in 2009 seems to confirm that belief. In this study, the AO randomly selected 554 persons granted early termination in fiscal year 2005 and matched them to an equal number of persons who reached full expiration that same fiscal year with comparable criminal histories, Risk Prediction Index (RPI) scores, and personal characteristics. In the three-year follow-up period, persons granted early termination were charged with fewer new offenses than the comparison group, and any new charges were generally less serious. Specifically, 80 persons granted early termination (14.4 percent) had new criminal charges[1] filed against them, while 90 persons (16.2 percent) of the full-term group had new charges filed against them. Of the new charges filed against the early termination group, 30.3 percent were felonies, while 36.5 percent were felonies for the comparison group. There was only one case among the early termination group that resulted in a known conviction for a violent new offense. According to available records most of the new charges were for misdemeanor or petty offenses, and more than 20

---
[1] This study used new criminal charges recorded in PACTS as the recidivism event. At the time of this study, arrest data was not available to the research team.



EXHIBIT A

**TABLE 1.**
*Percentage of Early Terminations of Successful Terminations (Closings) by Year*

| Year | Total Closings (excluding Revocations) | Early Terminations Number | Early Terminations Percent |
|---|---|---|---|
| 1995 | 25,656 | 4,214 | 16.4 |
| 1996 | 26,844 | 4,061 | 15.1 |
| 1997 | 26,307 | 3,875 | 14.7 |
| 1998 | 25,687 | 3,668 | 14.3 |
| 1999 | 26,594 | 3,524 | 13.3 |
| 2000 | 26,670 | 3,422 | 12.8 |
| 2001 | 27,951 | 3,222 | 11.5 |
| 2002 | 29,363 | 3,458 | 11.8 |
| 2003 | 31,354 | 5,217 | 16.6 |
| 2004 | 34,421 | 7,057 | 20.5 |
| 2005 | 33,472 | 7,119 | 21.3 |
| 2006 | 36,595 | 7,560 | 20.7 |
| 2007 | 35,403 | 6,809 | 19.2 |
| 2008 | 35,666 | 6,626 | 18.6 |
| 2009 | 35,835 | 6,494 | 18.1 |
| 2010 | 36,414 | 6,738 | 18.5 |
| 2011 | 37,522 | 6,710 | 17.9 |
| 2012 | 38,713 | 7,239 | 18.7 |

percent of the charges were either dismissed or ended in acquittal.

Armed with initial empirical evidence suggesting that early termination of appropriate offenders does not compromise public safety, the Judicial Conference continues to pursue early termination as a cost-containment measure. Public safety, of course, remains a paramount concern, however, and the AO continues to monitor the effectiveness of early termination as a measure that permits probation offices to focus supervision resources on persons most likely to recidivate, without compromising the statutory purposes of probation and supervised release.

This year, the AO conducted a similar but considerably broader-scale study on offenders who were granted early termination to determine if the results are consistent with the earlier, more preliminary, study. Using a more recent cohort of offenders whose supervision terminated in 2008, the researchers compared rearrest rates of 1,436 early-termed offenders with a matched group of offenders who served their entire supervision term. A three-year follow-up period was used to examine the rate at which offenders from the two comparison groups were arrested for new criminal behavior.

## Methodology

There were 15,266 supervised release (TSR) and probation cases closed in fiscal year 2008, of which 3,814 were for early termination and 11,452 were for successful expiration of term. This total excludes cases with missing RPI and criminal history scores, offenders younger than 18 years of age, as well as sex and violent offenders. Sex offenses included cases coded in the Probation and Pretrial Services Case Management System (PACTS) as rape or sex offense. Violent offenses included cases coded in PACTS as assault, firearms, homicide, kidnapping, racketeering, robbery, and simple assault. Of the 3,814 early-term cases, 1,436 were successfully matched to full-term cases by RPI category score (low, medium, high), criminal history category, gender, age category (5-year intervals), and district supervised. In total, this analysis includes 2,872 early- and full-term cases.

The research team leveraged the infrastructure built to support its Results-Based Framework (Baber, 2010). Under this framework, arrest records are assembled from criminal history databases and matched with data from PACTS. Consistent with the definition of recidivism established under this framework, the first arrest for new criminal conduct[2] within three years following the end of the supervision is analyzed for the two comparison groups.

## Description of Study Population

*Age*

As a result of the matching for this study, average ages of early-term and full-term offenders are nearly identical (Table 2). Full-term cases have an average age of 39.1 years at the start of supervision and 41.5 years at the end of supervision. Early-term cases have an average age of 39.5 at the start of supervision and 41.5 years at the end of supervision. Offenders who completed a full term of supervision were roughly the same age as their early-term counterparts (36.3 years old and 36.25 years old, respectively) at the time of their post-supervision arrest.

*Type of Supervision*

The proportion of probation and supervised release cases is similar for both study groups. Probation cases accounted for 32.7 percent of all full-term cases and 35 percent of all early-term cases (Table 3).

*Risk Level*

Because early termination criteria heavily favor low-risk offenders, as expected, low-risk offenders accounted for the majority of offenders in this study (74.4 percent). Medium-risk offenders accounted for 23.7 percent and high-risk offenders accounted for 1.8 percent (Table 4).

## Findings

As Table 5 illustrates, almost 15 percent (14.7) of all cases in the study cohort had a new arrest and offenders who served their entire supervision term had a rate nearly twice that of the offenders who received early termination (19.2 percent to 10.2 percent, respectively). Similarly, the rearrest rates for both study groups for major offenses only were tabulated (see Table 6). When minor offenses are excluded, the recidivism rates for both early-term and full-term offenders are considerably lower, but the proportion of rearrests between the two groups is consistent. Only 5.9 percent of early-term offenders were rearrested for a major offense following their release from supervision compared to 12.2 percent of full-term offenders.

---

[2] Arrests pursuant to a warrant for a technical violation of federal, state, or local probation or parole were ignored.

**TABLE 2.**
*Age at Start and End of Supervision for All Cases and Cases with a Post-Supervision Arrest*

|  | All Cases | | | | Post-Supervision Arrest | | | |
|---|---|---|---|---|---|---|---|---|
|  | Full term | | Early term | | Full term | | Early term | |
|  | Start | End | Start | End | Start | End | Start | End |
| N | 1,436 | 1,436 | 1,436 | 1,436 | 276 | 276 | 147 | 147 |
| Mean | 39.1 | 41.5 | 39.5 | 41.5 | 34.0 | 36.3 | 34.3 | 36.3 |
| Median | 38.0 | 40.0 | 38.0 | 40.0 | 32.0 | 34.0 | 34.0 | 35.0 |

**TABLE 3.**
*Supervision Type for All Cases*

|  | All Cases | | | |
|---|---|---|---|---|
|  | Full term | | Early term | |
| Supervision Type | Freq. | Pct. | Freq. | Pct. |
| Probation | 470 | 32.7 | 502 | 35.0 |
| TSR | 966 | 67.3 | 934 | 65.0 |
| Total | 1,436 | 100.0 | 1,436 | 100.0 |

**TABLE 4.**
*Risk Level of All Offenders*

|  | All Cases | | | |
|---|---|---|---|---|
|  | Full term | | Early term | |
| RPI category | Freq. | Pct. | Freq. | Pct. |
| Low risk | 1,069 | 74.4 | 1,069 | 74.4 |
| Medium risk | 341 | 23.7 | 341 | 23.7 |
| High risk | 26 | 1.8 | 26 | 1.8 |
| Total | 1,436 | 100.0 | 1,436 | 100.0 |

**TABLE 5.**
*Rearrest Rate for Full-Term and Early-Term Offenders (All Offenses)*

|  | All Cases | | Post-Supervision Arrest | | | |
|---|---|---|---|---|---|---|
|  |  |  | Full term | | Early term | |
| New Arrest | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
| No | 2,449 | 85.3 | 1,160 | 80.8 | 1,289 | 89.8 |
| Yes | 423 | 14.7 | 276 | 19.2 | 147 | 10.2 |
| Total | 2,872 | 100.0 | 1,436 | 100.0 | 1,436 | 100.0 |

**TABLE 6.**
*Rearrest Rate for Full-Term and Early-Term Offenders (Major Offenses Only)*

|  | Full term | | Early term | |
|---|---|---|---|---|
|  | Freq. | Pct. | Freq. | Pct. |
| No | 1,261 | 87.8 | 1,351 | 94.1 |
| Yes | 175 | 12.2 | 85 | 5.9 |
| Total | 1,436 | 100.0 | 1,436 | 100.0 |

### Rearrest Rates by Supervision Type

Rearrest rates for offenders serving terms of supervised release (TSR) cases are slightly higher than for probation cases for both early-term and full-term cases. Of the 470 full-term probationers, 17.7 percent (n = 83) were arrested within 36 months of completing their supervision term (see Table 7). In comparison, 9.2 percent (n = 46) of the 502 early-termed probationers were rearrested within 36 months of completing their supervision term. Of the 966 offenders on TSR who completed a full term of supervision, 20 percent (n = 193) were rearrested within 36 months of completing their supervision term. In comparison, 10.8 percent (n = 101) of the 934 early-term TSR cases resulted in a post-supervision rearrest.

### Time to Rearrest

As shown in Table 8, the time to post-supervision rearrest is slightly longer for early-term offenders. On average, full-term offenders were arrested 18.8 months after completing their supervision term while early-term offenders were arrested 19.4 months after being released from supervision.

### Risk Level

As expected, an accurate prediction of the risk of re-offending as indicated by the Risk Prediction Index (RPI) holds true for both early-term and full-term offenders who have completed supervision (Table 9). That is, high-risk offenders in both study groups have the highest rearrest rates. However, high-risk offenders who were granted early term were much less likely to be rearrested than their full-term high-risk counterparts. Though only six high-risk early-term offenders were rearrested, high-risk offenders accounted for 53.8 percent (n = 14) of the post-supervision arrests for full-term offenders but only 23.1 percent of arrests for early-term offenders.

### Time under Supervision

Early-term offenders were sentenced to supervision terms that were 12 months longer than offenders who completed a full term of supervision (39.8 months to 27.8 months, respectively). Although early-term offenders had longer supervision sentences, on average, they were on supervision 3.8 months fewer than full-term offenders (24 months to 27.8 months, respectively). On average, arrest-free early-term offenders were released from supervision 15.7 months before their scheduled supervision term was set to expire (Table 10).

**TABLE 7.**
*Supervision Type for Cases with a Post-Supervision Arrest*

| Supervision Type | Post-Supervision Arrest | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Full term | | Early term | | Total | |
| | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
| Probation | 83 | 17.7 | 46 | 9.2 | 129 | 13.3 |
| TSR | 193 | 20.0 | 101 | 10.8 | 294 | 15.5 |
| **Total** | **276** | **19.2** | **147** | **10.2** | **423** | **14.7** |

**TABLE 8.**
*Time to Post-Supervision Arrest*

| | Days to Arrest | | Months to Arrest | |
| --- | --- | --- | --- | --- |
| | Full term | Early term | Full term | Early term |
| N | 276 | 147 | 276 | 147 |
| Mean | 586.9 | 604.9 | 18.8 | 19.4 |
| Median | 576.5 | 647.0 | 18.0 | 21.0 |

**TABLE 9.**
*Risk Level of Offenders with a Post-Supervision Arrest*

| RPI category | Post-Supervision Arrest | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Full term | | Early term | | Total | |
| | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
| Low risk | 147 | 13.8 | 77 | 7.2 | 224 | 10.5 |
| Medium risk | 115 | 33.7 | 64 | 18.8 | 179 | 26.2 |
| High risk | 14 | 53.8 | 6 | 23.1 | 20 | 38.5 |
| **Total** | **276** | **19.2** | **147** | **10.2** | **423** | **14.7** |

**TABLE 10.**
*Supervision Term, Months Supervised, and Months Saved by Early Termination for Offenders with No Post-Supervision Arrest*

| | Supervision Term—Months | | Months Supervised | | Months Saved | |
| --- | --- | --- | --- | --- | --- | --- |
| | Full term | Early term | Full term | Early term | Full term | Early term |
| N | 1,160 | 1,289 | 1,160 | 1,289 | 1,160 | 1,289 |
| Mean | 27.8 | 39.8 | 27.8 | 24.0 | 0.0 | 15.7 |
| Median | 35.0 | 35.0 | 35.0 | 24.0 | 0.0 | 14.0 |

### Types of Offenses

As shown in Figure 1, when both major and minor offenses are included, the proportions of offense types for which the two groups are rearrested are similar. Public order offenses comprise the majority, followed by drugs, and then property offenses. Early-term offenders have a slightly higher percentage of public-order offenses, compared to their full-term counterparts (28.6 percent and 24.6 percent respectively). Drug offenses accounted for nearly an identical percentage of offenses for both study groups (20.4 percent for early-term offenders and 21 percent for full-term offenders.) Property offenses represented the third most frequent offense for both groups and the percentage of property crimes for early-term offenders was slightly lower than the percentage for the comparison group (15 percent and 17.8 percent, respectively). Violent offenses were a close fourth in terms of most frequent post-supervision arrest for both groups, with a slightly lower percentage of early-term offenders arrested for violence offenses (14.3 percent and 15.2 percent, respectively).

### Types of Major Offenses

When arrests for minor offenses[3] are excluded from the tabulations, drug, property, and violence offenses remain the most prevalent offenses for which both comparison groups are arrested (Figure 2). Major drug offenses accounted for a slightly greater percentage of arrests for early-term offenders than for full-term offenders (35.3 percent of arrests for early-term offenders and 33.1 percent for full-term offenders.) Property offenses represented the second most frequent major offense for both study groups and early-term offenders were arrested at a slightly lower rate than their counterparts for those property offenses (25.9 percent and 28 percent, respectively). Violent offenses were a close third most frequent arrest for a major offense for both groups, with early-term offenders having a slightly greater percentage than full-term offenders (24.7 percent and 24 percent, respectively).

### Months Saved on Supervision for Offenders Who Were Not Rearrested

Early-terminated offenders in fiscal year 2008 who had no post-supervision arrest were released 15.7 months earlier than their scheduled expiration date, which was one month earlier than early-term offenders released in fiscal year 2005. This suggests that even though early-term offenders were released sooner, their risk of re-offending did not increase (see Table 11).

## Discussion

Results from the AO's most recent study of offenders terminated in 2008 are compelling. The results suggest that offenders granted early termination under the current policies pose no greater danger to the community than offenders who serve a full term of supervision. These findings reaffirm the notion that early termination policies allow officers to make responsible decisions about which offenders to recommend for an early termination of their supervision term. Nearly twice as many full-term offenders were rearrested for major or minor offenses within three years as their counterparts who were terminated early (19.2 percent versus 10.2 percent respectively, see Table 5). When minor offenses are excluded from the tabulations, the relative proportion

---

[3] When the arrest records lacked information about the level of offense associated with the arrest event, researchers used imputation to make the major versus minor distinction. If the offense is designated as a misdemeanor or lower more than 75 percent of the time across all states, the offense was categorized as minor for purposes of these tabulations.



**FIGURE 1.**
*Offense Type for Post-Supervision Arrest Early- and Full-Term Offenders (All Offenses)*



**FIGURE 2.**
*Types of Offense for Post-Supervision Arrest by Close Type (Major Offenses Only)*

**TABLE 11.**

*Comparison of Months Saved by Early Termination for Offenders with No Post-Supervision Arrest—FY 2005 and FY 2008*

|  | FY 2005 Cases Months Saved | | FY 2008 Cases Months Saved | |
| --- | --- | --- | --- | --- |
|  | Full term | Early term | Full term | Early term |
| N | 443 | 463 | 1,160 | 1,289 |
| Mean | 0.0 | 14.7 | 0.0 | 15.7 |
| Median | 0.0 | 12.0 | 0.0 | 14.0 |

of rearrest rates for the two groups remains consistent, but the rates themselves are considerably lower for both groups. Specifically, only 5.9 percent of early-termed offenders were rearrested for major offenses compared to 12.2 percent of their full-term counterparts (Table 6). This suggests that probation officers should strongly consider offenders' actuarially predicted risk in the decision to recommend early termination of supervision.

Not only are early-terminated offenders arrested less frequently than their full-term counterparts, the time to rearrest is slightly greater. Specifically, early-term offenders remained arrest free for an average of 19.4 months compared to 18.8 for those who were full term. (See Table 8. Median times to arrest were 18 months for full term and 21 months for early term.) Further, the proportions of the types of offenses that constituted the arrests were nearly identical for both groups. For both groups, drug, property, and violent offenses comprised over 85 percent of all first arrests (Figure 2).

Because early termination criteria heavily favor persons at low risk to recidivate as indicated by the RPI or Post Conviction Risk Assessment (PCRA), approximately three-quarters (74.4 percent) of the offenders in this study group were low risk, 23.7 percent were medium risk, and 1.8 percent were high risk (Table 4). Overall, of the 423 offenders who were arrested from both comparison groups, high-risk offenders accounted for nearly 40 percent (38.5 percent) of those who were rearrested in the follow-up period (Table 9). In comparison, low-risk offenders accounted for 10.5 percent of those rearrested.

Perhaps more significantly, the results of the study indicate that while the early termination policy does not, as currently administered, compromise community safety, the attributable cost avoidance is significant. Although early-terminated offenders in the study originally received longer supervision sentences by approximately a year (39.8 months versus 27.8 months, see Table 10), on average they served 3.8 fewer months than full-term offenders (24 months to 27.8 months, respectively). At the most-recently published monthly cost of supervision of $286.11 per offender,[4] this equates to $1,087 per offender terminated early, for a total of $7,754,039 for the 7,132

---

[4] Source: April 10, 2012 memorandum reporting the fiscal year 2011 cost of supervision. The cost of supervision is calculated using the updated work measurement formula, probation/pretrial services officer salary costs, law enforcement account obligations, and miscellaneous operating expenses.

offenders who received early termination in calendar year 2012 alone.

The results of this study may inform other initiatives that are being considered by the Criminal Law Committee and the AO. For example, the Committee and AO staff may wish to consider whether early termination—and the risk principle generally—should be built into the next version of the staffing formula. Also, the Committee may want to consider whether changes to policy or legislation should be recommended to allow for the early termination of supervision for inmates who are compassionately released from prison under 18 U.S.C. § 3582(c). A recent report by the Inspector General of the Department of Justice critiqued the BOP's management of the compassionate release program. The BOP is currently reviewing its policies, and the courts should anticipate an increase in the number of inmates who are released from prison early under this authority. Because many of the inmates who are compassionately released are suffering from terminal illnesses, it may be unnecessary from a public safety perspective and inefficient from a resource perspective to continue to provide supervision in these cases.

# Early Termination of Supervision Cost-Effective and Safe

*Published on September 24, 2013*

A federal Judiciary study of early termination (/file/fedprob3rdproofssept13082213epdf) of supervision of low-risk offenders shows that the practice not only saves money, it does so without compromising public safety.

Three years after being released from supervision only 10.2 percent of early-term offenders had been rearrested, while 19.2 percent of full-term offenders were rearrested. Early termination is the policy of terminating a term of supervised release and discharging the defendant at any time after the expiration of one year of supervised release, providing certain criteria are met.

Early-term offenders save the probation and pretrial services system time when officers are no longer required to supervise them. Offenders receive early release from supervision an average of 15.7 months before their scheduled supervision term is set to expire. This, according to the report, allows districts to devote more resources to supervising and servicing offenders who are a greater risk to society.

Early termination also saves money. In fiscal year 2012, the supervision of more than 7,000 offenders was terminated early, saving the Judiciary more than $7.7 million.

"This practice promotes justice, conserves resources, and protects the public," said Judge Robert Holmes Bell, chair of the Judicial Conference Committee on Criminal Law.

The report looked at cases closed in FY 2008, then tracked for three years after supervision terms ended to see whether or not new crimes were committed. There were 15,266 cases of offenders with terms of supervised release following imprisonment and probation cases closed in fiscal year 2008, of which 3,814 were for early termination and 11,452 were for successful expiration of term.

The Judicial Conference endorsed early termination in 2003, as part of revised post-conviction supervised release policies. Under this policy, and according to statute, a court may terminate the terms of probation in felony cases after one year of supervision, if the offender's conduct warrants the change and it is in the interest of justice to do so.

Criteria were created by the Judicial Conference to help probation officers properly identify offenders for early termination of supervision. Those criteria include stable community reintegration; progressive strides toward supervision objectives; no history of violence and no aggravated role in the offense of conviction; no recent evidence of alcohol or drug abuse, or psychiatric episodes; and identifiable risk to public safety.

EXHIBIT B

## CERTIFICATE OF SERVICE

This is to certify that on this date, the foregoing *Motion for Early Termination of Supervised Release* was filed with the Clerk of Court in accordance with ECF rules using the CM/ECF system and was served electronically upon counsel for the other parties and by placing a copy of same in the United States Mail with adequate postage thereon, properly addressed to:

> Jill E. Steinberg, Esq.
> U. S. Attorney (SDGA)
> Department of Justice
> 22 Barnard Street
> Savannah, GA  31401
> david.estes@usdoj.gov

And by depositing a copy of same in the United States mail with adequate postage thereon to assure delivery upon:

> Mr. Chris Doughtie
> Probation Director
> Mr. Travis Gauthreaux
> Probation Officer
> U. S. Probation and Parole Office
> 600 James Brown Blvd., #3
> Augusta, GA  30901

This 14th day of May, 2024.

> /s/*John B. Long*
> JOHN B. LONG, ESQ.
> Georgia State Bar No. 457200
> Attorney for Defendant